**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>THE REAL PROPERTY LOCATED AT 8717 )<br>WINDSONG DRIVE, CHARLOTTE, NORTH )<br>CAROLINA, MORE PARTICULARLY )<br>DESCRIBED IN A DEED RECORDED AT )<br>BOOK 10641, PAGE 151 IN THE )<br>MECKLENBURG COUNTY REGISTER OF )<br>DEEDS ) | **CIVIL NO. 3:23-cv-00769** |

## <u>VERIFIED COMPLAINT FOR FORFEITURE *IN REM*</u>

NOW COMES Plaintiff the United States of America, by and through Dena King, United States Attorney, in a civil cause of forfeiture, and alleges as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1. This is a civil forfeiture action *in rem* against the real property located at 8717 Windsong Drive, Charlotte, North Carolina, more particularly described in a deed recorded at Book 10641, Page 151 in the Mecklenburg County Register of Deeds ("the Windsong House").

2. The Windsong House—a single-family residence located roughly 300 feet from Silver Mount Baptist Church and 1600 feet from Central Piedmont Community College, Harper Campus—has been the epicenter for narcotics trafficking in the Arrowood Road Corridor and is an astonishing example of a drug-involved premises prohibited by 21 U.S.C. § 856. Christopher Townsend, a resident of the house, engaged in the trafficking of a significant amount of fentanyl, methamphetamine, cocaine, and firearms from the front yard of the house. Helen McMillan, Townsend's mother and an owner of the house, has been present during the drug trafficking, willingly allowed the trafficking to continue, and even assisted in some trafficking.

3.      On August 29, 2022, law enforcement arrested Townsend and searched the Windsong House, resulting in the discovery of narcotics and firearms. On June 16, 2023, Townsend pled guilty to federal charges of conspiracy to distribute large quantities of fentanyl, methamphetamine, and cocaine. *See* WDNC Case 3:22-CR-159, Docs. 214, 215, and 220. The August 2022 arrest, June 2023 plea, and charges stemmed from Townsend's participation in the Charlotte-area George Rivens Drug Trafficking Organization ("DTO").

4.      From at least 2021 through the date of his arrest, Christopher Ahmad Townsend (a/k/a "Fat Man") (hereafter, "Townsend") resided with his mother, Helen McMillan, at the Windsong House. While he resided at the Windsong House, Townsend routinely directed prospective purchasers of narcotics to travel to the house to meet him for narcotics deals. He also routinely distributed large quantities of dangerous narcotics and firearms just outside of the house, entering and exiting the house during deals. McMillan was present for many of the deals, and even weighed out and packaged narcotics for Townsend, and assisted Townsend to effectuate some of the deals while he was away.

5.      Activity at the Windsong House included, among other things: (a) the distribution of approximately 586.70 grams of fentanyl[1] to Charlotte Mecklenburg Police Department ("CMPD") undercover detectives; (b) the distribution of approximately 881.6 grams of methamphetamine[2] to CMPD undercover detectives; (c) the distribution of approximately 249.81 grams of cocaine[3] to CMPD undercover detectives; (d) the sale of one AR-15 style rifle by a known drug trafficker to a CMPD undercover detective; (e) the sale of one AR-15 style pistol by a known drug trafficker to a CMPD undercover detective; (f) the sale of two unregistered "ghost

---

[1] Fentanyl is a powerful synthetic opioid that is similar to morphine but is 50 to 100 times more potent.
[2] Methamphetamine is a powerful, highly addictive stimulant that affects the central nervous system.
[3] Cocaine is a powerfully addictive stimulant drug made from the leaves of the coca plant native to South America.

guns"[4] by a known drug trafficker to a CMPD undercover detective; and (g) the sale of one illegal Glock "switch"[5] by a known drug trafficker to a CMPD undercover detective. All told, no less than three dozen narcotics purchases were conducted at the Windsong House.

6.      Thus, the Windsong House is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7), which authorizes the forfeiture of real property—including any right, title, and interest in the whole of any lot or tract of land and any appurtenances or improvements—because it is used, or intended to be used, to commit or to facilitate the commission of, a violation of 21 U.S.C. §§ 856(a)(1) and/or (2) (maintaining drug-involved premises), 841 (distributing a controlled substance), and/or 846 (controlled substance conspiracy).

7.      Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. §§ 983 and 985, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

9.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred within the Western District of North Carolina. Venue is also

---

[4] A "ghost gun" is a privately made firearm that lacks a commercially applied serial number.
[5] A "switch" is a relatively simple, albeit illegal, device that allows a conventional semi-automatic firearm to function as a fully automatic firearm. The switch is classified as a machine gun under federal law.

proper pursuant to 28 U.S.C. § 1395(b) because the Windsong House is located in the Western District of North Carolina.

10.     Based on the following facts, verified by CMPD Detective Dennis Miller, this action seeks the forfeiture of all right, title, and interest in the Windsong House.

## FACTS GIVING RISE TO FORFEITURE

11.     Since 2021, Charlotte-Mecklenburg Police Department Vice and Narcotics Detectives, in conjunction with the Federal Bureau of Investigation's Safe Street Task Force, have purchased dangerous narcotics and weapons from Townsend, whose previously established relationship with the Rivens DTO allowed Townsend to obtain a variety of narcotics to distribute from the Windsong House.

### *The Property Owners/Residents*

12.     The Windsong House is titled to Jimmie Lee McMillan Jr.[6] and Helen Johnson McMillan. During the times set forth herein, the primary residents of the Windsong House were Helen McMillan and Townsend (Helen McMillan's son).

13.     Helen McMillan has been convicted of Misdemeanor Food Stamp Fraud (Mecklenburg County 1998).

14.     Helen McMillan is the registered owner[7] of a 2003 Toyota Sequoia SR5 that is assigned NC registration plate TLP-6543.

---

[6] Jimmie McMillan Jr. appears on the July 23, 1999 general warranty deed but does not appear, based on the surveillance set forth herein, to be a resident of the Windsong House.
[7] Jimmie McMillan, Jr. also appears on the registration of this vehicle.



15.     Christopher Townsend was previously convicted of Possession of Marijuana (Mecklenburg County 2016) and thrice convicted of Carrying Concealed Gun (Mecklenburg County 2017 and twice in 2018). Further, as noted above, in June 2023, Townsend pled guilty for his role in a large-scale fentanyl, methamphetamine, and cocaine trafficking conspiracy that Townsend stipulated lasted from at least 2021 through 2022. *See* WDNC Case 3:22-CR-159, Docs. 214 and 215.

***Recent Drug-Related Criminal Activity at the Property***

16.     In the Fall of 2020, investigations into fatal overdoses in the Charlotte-area resulted in detectives identifying a nexus between a group of individuals distributing narcotics in the Skipwith Place—Nations Ford Road—Arrowood Road corridors. CMPD Vice and Narcotics Detectives began an investigation which led detectives to identify Christopher Townsend as a key figure in the drug trafficking occurring in those corridors—and as the intermediary between street level narcotic distributors and the Rivens DTO, with direct contact with—and access to, George Rivens.

17.     In May of 2021, through a series of undercover purchases with lower-level narcotics distributors, detectives began purchasing narcotics directly from Townsend at the Windsong House. On multiple occasions, Townsend made it known, verbally or visually, that he

was armed with a firearm during these narcotic transactions with the undercover CMPD Narcotic Detectives. A small number of the approximate 40 narcotic purchases that occurred at, or with a connection to, the Windsong House, are summarized below.

18.     On June 4, 2021, an undercover CMPD narcotics detective arranged to purchase heroin from Deion Thompson, one of the lower-level distributors of narcotics in the Skipwith Place—Nations Ford Road—Arrowood Road corridors. Prior to meeting the undercover detective, Thompson went to the Windsong House to obtain the narcotics. Upon receiving the narcotics from the Windsong House, Thompson proceeded to meet the undercover detective at another nearby location and exchanged $500.00 for the 6.40 grams of heroin. Forensic testing identified the substance distributed during the June 4, 2021 transaction as fentanyl.

19.     This method of obtaining narcotics—that is, via Thompson through Townsend from the Windsong House—was the *modus operandi* for a multitude of narcotics purchases throughout the earlier phases of the investigation. On many occasions, Thompson obtained the narcotics from the Windsong house and then met purchasers at another nearby location. However, undercover detectives were eventually able to deal directly with Christopher Townsend at the Windsong House.

20.     For example, on June 24, 2021, an undercover CMPD Narcotics Detective ("UC') arranged to purchase $260.00 worth of heroin from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC parked on the street immediately in front of the Windsong House. Then, Townsend used an associate to deliver 2.2 grams of fentanyl from inside the Windsong House to the UC. Forensic testing identified the

substance distributed to the UC as fluorofentanyl.[8] An image of McMillan's Toyota Sequoia parked in the Windsong House driveway at the time of the narcotics transaction is below:



21.    On July 14, 2021, a UC arranged to purchase $1,000.00 worth of heroin from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the narcotics transaction. On this occasion, Townsend emerged from inside the Windsong House armed with a firearm to deliver the 14.5 grams of fentanyl to the UC, who was parked on the road in front of residence. Forensic testing identified the substance as a combination of fentanyl and fluorofentanyl. At the time of the transaction, McMillian's Toyota Sequoia was parked in the Windsong House driveway.

22.    On July 23, 2021, at approximately 1:47am, the Windsong House was the target of a shooting into an occupied dwelling. Helen McMillan reported that the home was shot into by unknown assailants. Evidence collected from the scene was linked to firearms that were seized from another well-known and prolific narcotics trafficker in the Charlotte area. The ongoing narcotics trafficking—and the inherent violence associated with narcotics—contributed to the Windsong House being the target of the shooting. Despite this overt act of violence, narcotics distribution from the Windsong House continued.

---

[8] Fluorofentanyl is another class of syntenic opioids commonly referred to as fentanyl.

23.     On July 23, 2021, approximately fifteen hours after the Windsong House was fired upon, a UC arranged to purchase $1,850.00 worth of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. Townsend emerged from inside the Windsong House with approximately 29.60 grams of fentanyl and met the UC at the street to finalize the deal. Forensic testing identified the substance as fentanyl. Minutes after the deal, McMillan exited the residence. Images of Townsend and McMillan were captured by the surveillance team:



24.     On August 05, 2021, a UC arranged to purchase $2,800.00 worth of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. Townsend emerged from inside the Windsong House with approximately 41.60 grams of fentanyl and met the UC at the street to finalize the deal. Forensic testing later confirmed that the substance was, in fact, fentanyl.

25.     On August 19, 2021, a UC arranged to purchase $3,600.00 of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. Townsend emerged from inside the Windsong House, met the UC in the UC's car at the street, and delivered approximately 57.70 grams of fentanyl to the UC. Forensic testing identified the substance as a combination of fentanyl and tramadol.[9]

---

[9] Tramadol is a strong pain medication used to treat moderate to severe pain that is not being relieved by other types of pain medicines. Tramadol is a synthetic opioid and acts in the brain and spine (central nervous system) to reduce the amount of pain you feel.

26. On September 01, 2021, a UC arranged to purchase $500.00 of heroin from Deion Thompson. Thompson telephonically directed the UC to the Windsong House. A law enforcement surveillance team observed Thompson arrive at the Windsong House prior to the UC arriving. The surveillance team observed Townsend allow Thompson into the Windsong House prior to the deal. Once the UC arrived and parked on the street in front of the house, Thompson emerged from the house and exchanged approximately 5.40 grams of fentanyl for $500.00. During the encounter, Thompson made comments to the undercover detective, alluding to the fact that the Windsong House is where they (Christopher Townsend and Deion Thompson) sold (narcotics) from and was their headquarters.

27. On September 15, 2021, a UC arranged to purchase $2,500.00 worth of fentanyl from Townsend. A law enforcement surveillance team observed George Rivens, head of the DTO, at the Windsong House prior to the UC arriving at the Windsong House. Then, after the UC arrived and parked in front of the Windsong House, Townsend provided approximately 43.2 grams of fentanyl to the UC in exchange for the $2,500.00 as previously arranged. Townsend then handed money to George Rivens. Following the deal, Townsend and Rivens retreated into the Windsong House. Images of Townsend and Rivens were captured by the surveillance team:



Forensic testing identified the substance as a combination of fentanyl and tramadol.

28. On September 21, 2021, a UC arranged to purchase $200.00 worth of fentanyl from Joseph Connor—a known narcotics distributor in the Skipwith Place—Nations Ford Road—

Arrowood Road corridors. Connor directed the UC to meet him at the Windsong House. Upon the UC's arrival in his vehicle, Connor met the UC at the street and exchanged the $200.00 for approximately 2.4 grams of fentanyl. Connor then proceeded to knock on the front door of the Windsong House and speak—and exchange unknown items—with Townsend. Forensic testing identified the substance as a combination of fentanyl and tramadol. The following image depicts Joseph Conner, parked in the driveway of the Windsong House, walking to the front door to speak with Townsend following the sale of narcotics to an undercover officer:



Joseph Connor pled guilty to distribution of fentanyl in the federal criminal case against members of the Rivens DTO.

29. On October 06, 2021, a UC arranged to purchase $2,500.00 worth of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. Townsend met the UC at the street with approximately 42.30 grams of fentanyl. Forensic testing identified the substance as a combination of fentanyl and tramadol.

30. On November 19, 2021, a UC arranged to purchase $1,800.00 worth of fentanyl from Townsend. Despite being in Miami, Florida, Townsend orchestrated the narcotics transaction by utilizing Nalyia Herd—Townsend's girlfriend—to deliver the fentanyl. Townsend directed the UC to the Windsong House to complete the transaction. After the UC parked on the street at the Windsong House, Herd emerged from the Windsong House and delivered approximately 28.90

grams of fentanyl to the UC who was parked on the street. Forensic testing identified the substance

as a combination of fentanyl and fluorofentanyl. As depicted below, McMillian's Toyota Sequoia

was parked in the driveway at the time of the narcotics transaction:



31.     On December 09, 2021, a UC arranged to purchase $3,600.00 worth of fentanyl

from Townsend. Townsend telephonically directed the UC to the Windsong House to complete

the transaction. After the UC parked on the street, Townsend emerged from inside the Windsong

House with approximately 57.00 grams of fentanyl, met the undercover CMPD detective at the

street, and finalized the deal. Forensic testing identified the substance as a combination of fentanyl

and fluorofentanyl.

32.     On January 13, 2022, at approximately 1:50pm, a UC arranged to purchase fentanyl

and two "ghost gun" firearms for $4,700.00 from Christopher Townsend. After the UC and

Townsend agreed on the deal, a law enforcement surveillance team observed Townsend travel to

342 Sleepy Hollow Road. This residence was utilized by the Rivens DTO to store, package and

distribute narcotics and other items. Townsend met with Paul Kaber to obtain the firearms. Kaber

is the brother and a trusted confident of George Rivens and a member of the Rivens DTO.[10] Kaber

has pled guilty to a federal narcotics conspiracy offense in the prosecution of the Rivens DTO.

---

[10] Paul Kaber was in the company of, and arrested with, George Rivens on June 03, 2022, while in possession of, *inter alia*, approximately 5.7 kilograms of fentanyl, approximately 17.7 kilograms of suspected methamphetamine, approximately 1.9 kilograms of suspected cocaine, approximately 0.75 kilograms of suspected crack cocaine, approximately $29,732.00 in U.S. currency, and a multitude of firearms.

After Townsend and Kaber met, the surveillance team followed Townsend back the Windsong House.

33. Townsend telephonically directed the UC to the Windsong House to complete the transaction. After the UC parked on the street immediately in front of the Windsong House, Townsend emerged from the house with the approximately 57.00 grams of fentanyl and the two unregistered "ghost guns" and delivered the items to the UC in the street. During the transaction, Townsend was not only armed with a firearm, but volunteered the information that he was in possession of, and wanted to sell, an AR-15 style pistol. The UC arranged to purchase the firearm. Forensic testing identified the substance as a combination of fentanyl and fluorofentanyl. Images of the transaction are shown below:



34. On January 13, 2022, at approximately 4:15pm, after obtaining currency for the additional gun purchase, the UC again met Christopher Townsend at the Windsong House to purchase the AR-15 Pistol. The UC parked on the street and Townsend emerged from the house with the pistol. The UC ultimately purchased the pistol for $1,200. Later investigation identified the pistol as reported stolen from its original purchaser.[11] An image of the transaction is shown below:

---

[11] Individuals engaged in felonies, such as narcotics transactions, often cannot legally purchase firearms so they instead traffic in stolen firearms.



35.     On February 02, 2022, a UC arranged to purchase $3,600.00 of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC parked immediately in front of the Windsong House. Townsend emerged from the house, met the undercover CMPD detective in the street, and sold approximately 57.20 grams of fentanyl to the UC. Forensic testing identified the substance as fentanyl. An image of the transaction is shown below:



36.     On February 08, 2022, a UC arranged to purchase $1,800.00 worth of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC arrived and parked on the street immediately in front of the Windsong House. Townsend emerged from the house and met with the undercover CMPD detective in the street. Townsend delivered approximately 28.90 grams of fentanyl to the UC. Forensic testing identified the substance as fentanyl. The following image captured by surveillance shows Townsend with a firearm with a high-capacity magazine sticking out of his lower leg pocket as he conducted the narcotics transaction at the Windsong House.



37.     On February 22, 2022, a UC arranged to purchase $5,700.00 worth of fentanyl from Townsend. Townsend directed the UC to the Windsong House to complete the transaction. After the UC parked on the street immediately in front of the house, Townsend emerged from the house, met with the UC, and delivered the approximately 87.70 grams of fentanyl. Forensic testing later identified the substance as fentanyl. An image of the transaction is shown below:



38.      On February 28, 2022, law enforcement officers conducting electronic surveillance intercepted phone calls between an Unidentified Male (UM), Townsend, and McMillan. In summary, the UM called Christopher Townsend and asked if the UM could come to the Windsong House to purchase marijuana. Townsend informed the UM that he was leaving the Windsong House but would leave the marijuana with his mother (Helen McMillan) and that UM could retrieve the marijuana from her. Townsend then called McMillan and asked her to give "Q" (the UM) some marijuana. McMillan said "no" to the request but then went on to look for and find the marijuana. Later, a law enforcement surveillance team observed "Q" enter the Windsong House and emerge a short time later, accompanied by a shadowy figure, believed to be McMillan.

39.      On March 02, 2022, an Unidentified Female (UF) telephonically contacted Townsend about purchasing psychedelic mushrooms. Townsend informed the UF that he was at the airport but that she could go by the house and tell Helen McMillan that the UF was there for mushrooms. On the same day, McMillan and Townsend spoke telephonically. McMillan mentioned that Townsend had forgotten to leave "rent money." McMillan responded that there

should be money on his dresser but that, "[i]f not, I'll just have a play come through and you got to serve them and get the money."

40.    On March 03, 2022, Townsend telephonically contacted McMillan and the two discussed how much drugs were supposed to weigh when Helen McMillan placed them on a scale. For example, McMillan asked what "it" (drugs) is supposed to weigh—to which Christopher Townsend told her, "3.5." In drug parlance, "3.5" is equivalent to an "eight-ball" or eighth of an ounce. Townsend further explained to McMillan that the easiest way to measure drugs was to utilize a plastic cup, put the cup on a scale, zero-out the scale, and then fill the cup and weigh it.

41.    Later that day and separate from the preceding phone call, an Unidentified Female spoke telephonically with Townsend. The UF advised that she was at the house (Windsong House). Townsend asked if the UF saw his mother's car, to which the UF advised that she did see the car. Townsend then told the UF to go on into the house. The UF then handed the phone to McMillan. At that point, Townsend instructed McMillan to let the UF "wear, slip on some stuff . . . it should—it is sitting on the brown dresser." In response, McMillan did not hesitate or need clarification of what Townsend was talking about, instead responding by asking Townsend how much "it" was supposed to weigh, to which Christopher Townsend informs her that "it" should weigh a gram—clarifying by saying 1.00. McMillan further participated in the narcotics trafficking when she confirmed with Townsend whether UF would use CashApp to send money to Townsend for the gram, to which Townsend responded in the affirmative. The UF then exited the residence a short time after arriving. Below are images of McMillan standing by her vehicle outside of the Windsong House and speaking with UF while UF was on the phone with Townsend. Also depicted below is an image of the UF departing the residence, although it is unclear if she is carrying narcotics as she exits.



42.     On March 22, 2022, a UC arranged to purchase $9,000.00 worth of cocaine from Townsend. The UC parked at the street immediately in front of the Windsong House, Townsend emerged from the house, and the UC provided $5,000.00 as a down payment for the cocaine. Thereafter, Townsend immediately took the money to 342 Sleepy Hollow Road, Charlotte, North Carolina and met with George Rivens.[12] Townsend then returned to the Windsong House and exchanged approximately 256.00 grams of cocaine for the remaining $4,000.00 held by the UC. While speaking with the UC about the quality of the cocaine during the transaction, Townsend stated with a braggadocios tone, that "I told you . . . I fuck with the Cartel, man." Forensic testing identified the substance as cocaine hydrochloride. An image of the transaction is shown below:



---

[12] The DTO regularly engaged in business at the Sleepy Hollow Road location, and Townsend would often travel there to obtain narcotics from Rivens and/or pay Rivens for narcotics.

43.     On March 25, 2022, a UC arranged to purchase $3,600.00 worth of fentanyl from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC parked on the street immediately in front of the Windsong House. Townsend emerged from the house with approximately 57.60 grams of fentanyl and then finalized the transaction with the UC at the street. Forensic testing identified the substance as fentanyl.

44.     On April 31, 2022, telephonic surveillance captured McMillan assisting Townsend with preparing and distributing fentanyl. Specifically, an individual identified as Andrew Smith ordered a "100" and "50" from Townsend. Townsend informed the individual that Townsend was not home, but that Townsend would ask/direct his mother to make the order. Upon Townsend telephoning McMillan and telling McMillan that someone was stopping by the house, McMillan asked, "[w]hat am I fixing for him?" Townsend stated, "[t]he fent." McMillan proceeded to package and distribute the narcotics. The following images are of McMillan's vehicle present at the residence at the time of the telephonically arranged and monitored transaction, and of the narcotics purchaser meeting McMillan at the front of the residence:



45.     After Smith left the Windsong House, uniformed officers conducted a traffic stop on the vehicle for a regulatory violation. The officers identified Smith and conducted a consent search, but nothing was found at the time of the search.

46.     However, after the search, telephonic surveillance of a conversation between Smith and Townsend on April 04, 2023, revealed Smith telling Townsend about the traffic stop, the police asking to search the car, and that Smith had hidden the narcotics in/near one of his body cavities.

47.     On April 06, 2022, a UC arranged to purchase $4,500.00 worth of methamphetamine from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC parked on the street immediately in front of the Windsong House. Townsend met the UC in the street with approximately 457.10 grams of methamphetamine. Forensic testing identified the substance as methamphetamine with a 97% purity.

48.     On April 20, 2022, a UC arranged to purchase $4,500.00 worth of methamphetamine from Townsend. Townsend telephonically directed the UC to the Windsong House to complete the transaction. The UC arrived and parked on the street immediately in front of the Windsong House. Townsend emerged from the house and presented the UC the opportunity to purchase an AR-15 pistol firearm for $1,700.00—which the undercover detective agreed to purchase. Townsend met the undercover CMPD detective in the street with approximately 444.60 grams of methamphetamine and one AR-15 pistol. Forensic testing identified the substance as methamphetamine with a 95% purity. Images of the transaction are shown below:



49.     On May 05, 2022, Christopher Townsend called a UC and offered to sell a firearm to the UC for $1,400.00. The UC agreed to the purchase. Townsend later informed the UC that the firearm had already been sold, but that a machinegun conversion "switch" was available for purchase. Townsend telephonically directed the UC to the Windsong House to complete the transaction. After the UC parked on the street immediately in front of the Windsong House, Townsend emerged from the house, met the undercover detective in the street, and exchanged $1,200.00 for the machinegun conversation switch.[13]

50.     On August 29, 2023, based on federal criminal charges related to the Rivens DTO, federal agents arrested Townsend and executed a federal search warrant at the Windsong House. Inside the residence, agents seized a 9mm Canik pistol, approximately 43 grams of fentanyl, digital scales, Narcan Nasal Spray, body armor, assorted pistol ammunition, and an empty AR15 magazine. Forensic testing confirmed that the seized substance was a mixture of heroin and fentanyl.

---

[13] The Bureau of Alcohol, Tobacco, Firearms and Explosives Firearms Technology Criminal Branch examined the switch and authenticated as a working "machinegun" as defined by 26 U.S.C. § 5845(b).

# FIRST CLAIM FOR RELIEF
## (21 U.S.C. §§ 856(a)(1) & (2))

51.     The United States incorporates by reference the allegations set forth in the above

paragraphs as if fully set forth herein.

52.     Entitled "Maintaining drug-involved premises," Title 21 U.S.C. § 856 makes it

unlawful to

(1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance;

[or]

(2) manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

*See* 21 U.S.C. §§ 856(a)(1) and (2).

53.     Further, Sections 841 and 846 of Title 21 prohibit the distribution of illegal

narcotics and conspiracies to commit the same. *See* 21 U.S.C. §§ 841 and 846.

54.     The Windsong House is subject to forfeiture under 21 U.S.C. § 881(a)(7) because

the Defendant Property was used, or intended to be used, to commit or to facilitate the commission

of, a violation of 21 U.S.C. §§ 856(a)(1) and/or (2), 841, and/or 846.

55.     The United States does not request authority from the Court to seize the Defendant

Property at this time. The United States has or will, as provided by 18 U.S.C. 985(b)(2) and (c)(1):

a.      post notice of this action and a copy of the Complaint on the Defendant Property;

b.      serve notice of this action on the Defendant Property owners, and any other person or entity who may claim an interest in the Defendant Property, along with a copy of this Complaint; and

c.      file a *lis pendens* in county records giving notice of the Defendant Property's status as a defendant in this *in rem* forfeiture action.

## PRAYER FOR RELIEF

By virtue of the foregoing, all right, title, and interest in the Defendant Property vested in the United States at the time of the commission of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States of America.

WHEREFORE, the United States of America respectfully prays the Court that:

(1)   due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

(2)   judgment be entered declaring the Defendant Property to be condemned and forfeited to the United States of America for disposition according to law; and

(3)   the United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Defendant Property as required by 28 U.S.C. § 1921.

Respectfully submitted this the 15th day of November, 2023,

DENA J. KING
UNITED STATES ATTORNEY

**/s/ J. Seth Johnson**
Texas Bar No. 24083259
**/s/ Benjamin Bain-Creed**
Florida Bar No. 21436
Assistant United States Attorneys
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Email: seth.johnson@usdoj.gov
Email: benjamin.bain-creed@usdoj.gov

**VERIFICATION**

I declare under penalty of perjury that the factual information contained in the foregoing

Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the _15_ day of November, 2023.

_____

Dennis J Miller, CMPD Detective